## Louisville & N. R. Co. v. Chapman's Adm'x.

May 8, 1945.

C. S. Landrum, C. E. Rice, Jr., and E. B. Rose for appellant.

J. Mott McDaniel, C. E. Tyree, Clifford Smith and Joseph R. Carpenter for appellee.

OPINION OF THE COURT BY JUDGE HARRIS—Reversing.

This is a damage action under the provisions of KRS 277.310 and 277.320, known as the State Employer's Liability Act, by the administratrix of the estate of Thomas L. Chapman, who was run over and killed by one of appellant's trains while he was in line of duty as one of appellant's operators. From a $10,000 award in her favor, the railway company has appealed.

At the place of the accident, which is near the top of what is known as Chenowee Hill, in Breathitt county, the appellant has two lines of tracks—a main and a spur. At its northerly end the spur connects, by means of a spring switch, with the main line at a point some sixty feet north of what is designated as the operator's office, which will be referred to later, and at its southerly end it connects with the main line at a point some miles south of the operator's office. The main line, which is the

easterly of the two tracks, is used by the north bound trains, and the spur is used by the south bound ones. At the operator's office—and so arranged as to be easily observable from an approaching train—is a semaphore, which is equipped with red, green, and yellow lights. As a train approaching from the north arrives at from 600 to 800 feet of the operator's office, its engineer is required to blow its whistle four times so as to apprise the operator of its approach. Upon receipt of this signal, it is the duty of the operator to so manipulate the semaphore as to indicate to the engineer whether the train shall proceed on through without stopping and without receiving any order; or whether it shall come to a complete stop at the operator's office; or whether it shall lessen its speed, proceed slowly and receive a written order, without stopping. If the train is not to be stopped, but is simply to have its speed lowered so that a written order may be delivered, the operator gives the engineer a yellow board, as it is expressed in railroad terminology, and places the written order on a hoop, which he hands to the engineer or to the fireman, as the conditions require, as the train passes. If the train is to pass without stopping and without receiving an order, a green board is given. If a complete stop is required, a red board is given. Normally, the board is red, and so remains until the operator responds to the engineer's signal. The type of order indicated by a yellow board is denominated a "19." The operator's office is located about 10 feet west of the spur track and, as previously indicated, about 60 feet south of the switch point. Extending from the northerly, or entrance, end of the office to within a short distance of the west side of the spur track, is a four-foot walk which is used by the operator when he has occasion to deliver an order. About 8 feet south of the office is a small one room structure which is used as sleeping quarters by the operators. The spring switch previously mentioned was installed on the 8th day of August, 1943, and is such that all north bound trains automatically pass through its point and continue on the main line, while all south bound trains automatically pass from the main line onto the spur track. Prior to the installation of the "spring," the switch was of the old hand operated type; that is, it was necessary for the trains to be brought to a stop and for one of the train's employees to unlock and throw the switch by hand.

On the occasion of the accident, the appellee's intestate arrived about four o'clock in the afternoon and went on duty at midnight. Although he had previously worked at this office and was familiar with the general situation, this was his first work there since the change had been made in the method of operating the switch. After he had been on duty about 30 minutes a train, which consisted simply of two engines and their tenders and which was being used in helping other trains over Chenowee Hill, approached from the north, backing. On the front of the forward tender there was a headlight similar to the one on the front of the engine, and which afforded the engineer and fireman the identical opportunities for observation ahead that would have been afforded had the train been moving forward. When the train had reached the point where under the company's rules and regulations he was required to do so—that is, within from 600 to 800 feet of the operator's office—the engineer signalled its approach by four blasts of its whistle. Thereupon the appellee's intestate, who was the only operator on duty at the time, responded with a yellow board and by proceeding over the walkway from his office towards the tracks, carrying his hoop and what proved to be a "19." Instead of proceeding simply to the end of the walkway and stopping, he stepped onto the track directly in front of the train, and was thereby run over and killed.

The appellant argues that it was entitled to a peremptory instruction, and that the instructions which were given were incorrect. The appellee argues that a peremptory instruction should not have been given; that the instructions which were given were correct; and that the judgment should be affirmed.

In their efforts to sustain their respective positions the parties have favored us with 251 pages of briefs, in which they classify and argue thirty-five points and cite some sixty odd authorities. To undertake an exposition of each of those points, or to analyze and differentiate the multiplicity of authorities cited, would present an almost interminable task and extend this opinion beyond all reasonable length. So, since it is our conclusion that a peremptory instruction should have been given in favor of the appellant, it must suffice that this opinion be confined largely to a consideration of the following points in appellee's classification: (a) KRS 277.310 and 277.320 as affecting assumed risk and contributory negligence;

(b) failure to change track when switch was changed; (c) failure to maintain lookout and give warning; (d) discovered peril.

(a) "277.310 (820b-1) Liability of railroads for injury or death of employes. Every common carrier by railroad, while engaged in commerce in this state, shall be liable in damages to any person suffering injury while he is employed by the carrier in such commerce, and in case of the death of such person shall be liable to his personal representative, for such injury or death as resulted in whole or in part from the negligence of any of the officers, agents or employes of the carrier, or by reason of any defect or insufficiency, due to its negligence, in its track, roadbed, rolling stock, machinery, docks, boats, wharves or other equipment."

"277.320 (820b-2; 820b-3) Contributory negligence; assumption of risk. In any action brought against a common carrier by railroad under KRS 277.310 to recover damages for injury to or death of any employe, the employe shall not be held to have assumed the risk of his employment nor to have been guilty of contributory negligence in any case where the violation by the carrier of any state or Federal statute enacted for the safety of employes contributed to the injury or death of the employe. In a case where a safety statute has not been violated, the fact that the employe was guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to the employe."

It will be observed that section 277.310 does not increase the legal liability of a railroad company to its employees, or deprive it of any of its common law defenses, unless its negligence contributes to the employee's accident. If, however, such negligence on its part contributes to the accident, then it becomes liable even though its negligence may not be the sole proximate cause of the accident—the extent or degree of such liability being fixed by the last sentence in section 277.320. In fine, before the statute was enacted the company was liable only when its negligence was the proximate cause of the accident, whereas, it is now liable, proportionately, if its negligence merely contributes to the accident.

The effect of the first provision in section 277.320 is to deny to the railway company, completely, the defenses

of contributory negligence and assumed risk in those instances in which its violation of a state or federal safety statute contributes in any degree to the employee's accident  The converse of this is that if there is not a violation of one of the safety statutes, or if such a violation does not contribute to the accident, the company may invoke either or both defenses  The effect of the second provision is that where there is no violation of a safety statute, or if such a violation does not contribute to the accident, the employee's contributory negligence shall not bar a recovery completely, but only to the extent or in the proportion that it contributes to the accident.  The converse, however, is equally the law; that is, if the employee's negligence was the sole cause of the accident and not merely a contributing one, there can be no recovery.

Appellee's cited cases of Chesapeake & O. R. Co. v. Howard's Adm'x, 244 Ky. 838, 51 S. W. 2d 461; Poole v. Lutz & Schmidt, 273 Ky. 586, 117 S. W. 2d 575. Fluehart Collieries Co. v. Elam, 151 Ky. 47, 151 S. W. 34, are not available to her under the undisputed evidence in the case.

The Fluehart Collieries case was one between a coal mining company and one of its employees.  This circumstance of itself deprived the employee of the benefit of the statutes supra, which relate only to railroad companies and their employes.  In that case the miners were required to pass through an elevator shaft which was unsafe. The evidence showed without contradiction that with a little expense there could have been constructed a passway which would have made the place safe.  The evidence further established that no time was fixed for the descent of the elevators, and that no notice or warning of any kind was given in connection with their operation.  In short, it was shown that the company did not exercise ordinary care to provide the employee a reasonably safe place to work, but on the contrary furnished him a place which was extremely dangerous although it could have made the place safe by the expenditure of a few dollars.  Under those facts we said that the risk which an employee assumes is the risk which is ordinarily incident to that type of employment, and that he does not assume a risk which results from the master's failure to perform his duty.

In the Poole v. Lutz & Schmidt case, as stated in the syllabus, the employee of the principal contractor observed that the employees of an independent contractor were carelessly demolishing a brick wall on the premises and undertaking to go through a door in the wall, was struck by a flying, loosened brick. Under those facts we held that the employee was negligent as a matter of law, and that he had assumed the risk.

The case of Chesapeake & O. Ry. Co. v. Howard's Adm'x was instituted and practiced under the Federal Employer's Liability Act, 45 U. S. C. A. sec. 51 et seq. The facts were that the plaintiff's intestate, who was a brakeman, stepped from the train on which he was working onto an adjoining track and was struck and killed by a train which approached from his rear. There was no evidence that he knew of the presence or of the approach of the train. In concluding our opinion in that case, we said that the yard where the accident occurred was used by a large number of employees, and that their presence should have been anticipated; that ordinary care required those in charge of the engine to be on the lookout and to give timely warning of the train's approach; that the evidence on those points being in conflict, the case was one for the jury.

(b) The argument that when the switch was changed from a hand operated one to one of the spring type the tracks should also have been changed, finds no support in the evidence or in the authorities. The evidence shows that appellee's intestate had previously worked at that point, was familiar with the location of the tracks and the switch point, and knew that south bound trains used the spur track. In this connection we quote from the testimony of operator Treadway:

"Train No. 3 is due at Yeadon at 4:10 P. M. Mr. Chapman and I got off at Yeadon and he went in the office with me and stayed around while I worked and did not go to bed until sometime after Train No. 2 ran, which is due at Yeadon at 5:54 P. M. To the best I can remember he went to bed around 6:15 or 6:30 P. M. While he was in the office with me, Local Train No. 25 passed Yeadon or came through the spring switch at the north end of the passing track and through the passing track. I recall that I had a '31' order for No. 25, and he

also saw that No. 3 used the passing track as he came in on No. 3 and got off at Yeadon. While he was there with me at Yeadon we were talking about this spring switch and operator Chapman asked me what threw this switch over so that northbound trains could pass through it, and I told him that as I understood that the wheels and the weight of the train shoved this switch over for northbound trains. I also told him that the switch was set in normal movement for the passing track and that southbound trains came into the passing track without the switch having to be thrown, as it was already set for the passing track.''

This witness further testified that on the bulletin board in the office, beside the operator's desk, there was a bulletin which had been placed there for the benefit of the operators, and which the operators were required to familiarize themselves with, advising that the south bound train would use the track nearest the operator's office. And the fireman on the forward engine—introduced by the appellee and not contradicted—testified that the train came through the switch point and onto the spur track at three or four miles an hour; that he saw the operator come out of the office, carrying his hoop, order, and lantern; that as the operator came out of the door he and the front of the train were almost the same distance from the point of the accident; that instead of stopping, as was expected, he stepped in front of the train.

Generally speaking it would make no difference from the standpoint of safety or hazard, whether the switch point through which a slowly moving train passed from a main line onto a spur track was operated by hand or by a spring. And certainly, under the uncontradicted evidence, it made no difference in this case. For whatever appellee's intestate may have expected or have had the right to expect, the fact remains that the instant he came out of the office the engine, in all of its hugeness and noise, was there, in movement, on the spur track before his very eyes—in obedience to orders which he, himself, had given.

(c) On the question of lookout little need be said. Not only was there no evidence that a lookout was not maintained, the testimony is that a lookout was kept. In the light of the sudden and unexpected conduct of the

operator, the failure of the company to have an employee stationed on the tender cannot reasonably be said to have contributed to the accident.

(d) The complaint that no signal or warning was given just before the train entered the switch, or just before the decedent was struck, completely overlooks the purpose of a warning signal and the evidence. See McCalley's Adm'r. v. Chesapeake & O. R. Co., 169 Ky. 47, 183 S. W. 234, L. R. A. 1916F, 551, and the cases therein cited; Chesapeake & O. R. Co. v. Harrell's Adm'r, 258 Ky. 650, 81 S. W. 2d 10, 52 C. J. 577.

There is no evidence from which it could be reasonably inferred that appellee's intestate's peril could have been discovered or averted by the exercise of ordinary care by those in charge of the engine. The decedent's duty, as those in charge of the engine knew, required him to approach to within a step or so of the track, and it also shows that from that point he suddenly stepped onto the track, immediately in front of the train. Hence, there is no place here for an application of the discovered peril doctrine. The circumstance that decedent's body was found severed on the track at a point opposite the sleeping quarters, which was some 20 or 30 feet below the end of the walkway, does not minimize the effect of the positive testimony which shows that he entered upon the track at or near the end of the walkway.

For the reasons indicated the judgment is reversed and the case remanded for further proceedings consistent herewith.

A ruling on the instructions and all other questions not passed upon herein is reserved.